UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

OMICRON CAPITAL, LLC,

                    Plaintiff,

                                              05 Civ. 0960 (RWS)

     - against -

                                              O P I N I O N

OMICRON CAPITAL, LLC,

                    Defendant.

----------------------------------------X

A P P E A R A N C E S :



        FELDMAN WEINSTEIN
        Attorneys for Plaintiff
        420 Lexington Avenue
        New York, NY 10170
        By:  ERIC WEINSTEIN, ESQ.
             Of Counsel

        QUINN EMANUEL URQUHART OLIVER & HEDGES
        Attorneys for Defendant
        335 Madison Avenue, 17th Floor
        New York, NY 10017
        By:  JEFFREY A. CONCIATORI, ESQ.
             EMILY B. COSTELLO, ESQ.
             Of Counsel

**Sweet, D.J.,**

Defendant Omicron Capital LLC ("Defendant") has moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P., to dismiss the complaint filed by Omicron Capital, LLC ("Plaintiff"). Plaintiff has cross-moved for summary judgment on its complaint. At issue is the use of the common name of the parties. For the reasons set forth below, the motion of Defendant is granted, and the cross-motion of Plaintiff is denied.

## Prior Proceedings

Plaintiff filed its complaint on January 28, 2005, seeking an injunction to bar Defendant from the use of the name Omicron Capital LLC and to cancel its trademark.

Discovery proceeded, and Defendant filed its motion for summary judgment on November 18, 2005. Plaintiff cross-moved for summary judgment on December 2, 2005. Both motions were heard on January 18, 2006.

## The Facts

The facts are set forth in dueling Local Rule 56.1 Statements and Local Rule 56.1(b) responses, and are not in dispute except as noted.

1

Plaintiff is a New York City-based company founded by Oliver Morali ("Morali") in 1997. Defendant describes Plaintiff as a hedge fund, while Plaintiff describes itself as an investment advisor to hedge funds. Morali selected the name "Omicron Capital" because he believed the name evoked his experience and background in derivatives markets[1] and because his initials are O.M. Morali registered the Internet domain name "omicroncapital.com" in 1997, and Plaintiff has used the service mark "Omicron Capital" continuously since then. Morali and Bruce Bernstein ("Bernstein") are equal partners of Omicron Capital, LLC.

Plaintiff's primary business consists of raising money from sophisticated investors and investing in private equities, trading in corporate debt and equity, and managing investment funds. Plaintiff provides venture and debt financing to small companies, and manages a portfolio of investments using derivative techniques. Plaintiff's hedge fund takes a financial position in the companies in which it invests.

There are three families of funds associated with Plaintiff Omicron Capital, LLC: Omicron Master Trust (composed of Private Investors, LP and Private Investors International Limited), Medway Partners (composed of Kent Capital and Kent Capital International), and the Lilac family of funds.

---

[1] Greek letters are used in connection with risk management practices. Omicron, the fifteenth letter of the Greek alphabet, is used to designate the credit risk in a derivative position.

The primary vehicle through which Plaintiff invests is Omicron Master Trust, an offshore Bermuda-based entity with approximately $250 million under management. This represents approximately 85% of Plaintiff's total assets under management. Plaintiff is an investment advisor to Omicron Master Trust. Omicron Master Trust focuses its investments on small-cap and micro-cap companies. It seldom makes investments in private companies and typically invests only in companies that have a market capitalization in excess of $25 million.

Omicron Master Trust often invests in public companies through what are known as Private Investment in Public Equity ("PIPE") transactions. PIPE transactions take a variety of forms, including asset-backed lending. Plaintiff describes its investment objective as maximizing returns to investors while minimizing the downside risk and volatility generally associated with such investments.

There are approximately forty-five to sixty domestic (or "onshore") investors in the Omicron Master Trust. These include high net worth individuals, private banks (typically offshore banks), and family offices, but most of the investors are other funds. At this time, the minimum investment in Omicron Master Trust is $500,000. In 2006, the minimum will be raised to $750,000. The average investment in Omicron Master Trust is $3 million and the median is approximately $5 million. The most

substantial investor in Omicron Master Trust has invested approximately $35 million in the fund.

Investors in Plaintiff's hedge fund must agree to keep their money in the fund for six months. Any investor who withdraws an investment between six months and a year is penalized 2%. After a year, an investor may redeem its money every quarter with thirty days' notice.

In 2003, Plaintiff invested in 87 separate transactions. In 2004, Plaintiff invested in 135 transactions totaling $162 million. Through the first three quarters of 2005, Plaintiff invested in 91 transactions totaling $76 million.

Before investing the assets of its fund, Plaintiff meets with a target entity's management, contacts its suppliers and end users, goes through its books, and examines all publicly available information.

When the size of a transaction may be larger than Plaintiff is willing or able to undertake, Plaintiff relies on a network of other funds similarly situated in the market to invest as co-participants in the transaction. The network allows Plaintiff to share investment opportunities with other funds that it leads, and to benefit from opportunities from other transactions that they lead.

4

Plaintiff's largest current holding is Zoltek Companies Inc. ("ZOLT"), a publicly traded company based in St. Louis that Plaintiff has been dealing with since 2003 in a transaction structured as an asset-backed obligation.

Plaintiff obtains investors in three primary ways. First, investors contact Plaintiff based on personal or professional referrals. Second, investors are introduced to Plaintiff through presentations made by Plaintiff's principals or employees at industry conferences and seminars. Third, investors read about Plaintiff in trade publications for accredited investors such as HedgeWorld. In addition, Plaintiff's investors may hear about Plaintiff through listings on independent hedge fund databases such as Hedge Fund Net, Placement Tracker, and Knobias. Plaintiff does not monitor these hedge fund databases for accuracy.

Because Plaintiff is an unregulated entity, under the rules of the SEC it may not advertise to the public. Plaintiff does no print or television advertising. Its annual marketing budget is less than $10,000, which is expended primarily on travel by its principals to promote their services in face-to-face meetings with prospective investors. Plaintiff does not maintain a website.

Plaintiff's investors are "smart, savvy, high net worth individuals, successful people, institutional money" that make

5

investments with Plaintiff after an "analysis of how [it] manage[s] [its] fund" and a significant amount of research. (Def.'s 56.1 Stmt. ¶ 11) An investor considering investing with Plaintiff "typically" speaks with Bernstein or Morali, receives written information from Plaintiff and visits Plaintiff's office for a meeting. (Def.'s 56.1 Stmt. ¶ 12) Occasionally, Plaintiff and the prospective investor will hold follow-up meetings and the prospective investor will perform due diligence.

The due diligence performed by Plaintiff's investors includes conducting background checks on Plaintiff's principals, speaking with Plaintiff's attorneys and prime brokers, checking references from other investors, scrutinizing public information on Plaintiff's investments, and looking at Plaintiff's track record. Most of Plaintiff's investors invest in other funds as well.

All investors in Plaintiff's hedge fund must be "accredited" under rules promulgated by the Securities and Exchange Commission ("SEC"), requiring that an investor have a net worth in excess of $1 million in liquid assets or have earned more than $200,000 each year for the previous three years.

Plaintiff receives a 1.75% management fee on all of the money that it manages, as well as a 20% annual performance fee if the fund has performed positively in that year.

6

Upon founding Plaintiff, Morali did not seek the advice of an attorney regarding the adoption of the name "Omicron Capital" and performed no trademark searches to ascertain the availability of the name or to identify others who may have been using it. Plaintiff has never applied for or registered the mark "Omicron Capital" or any other marks with the United States Patent and Trademark Office ("USPTO").

Plaintiff has never commissioned any studies or developed any strategies, internally or through an outside firm, regarding the use of "Omicron."

As of the date of their depositions in this action, conducted on October 26, 2005, neither principal of Plaintiff was aware that variations of the word "Omicron" are used in commerce by multiple entities, such as omicronfinancial.com, Omicron Associates, and Omicron Investments, Inc.

Apart from the complaint filed herein, Plaintiff has never filed a lawsuit related to the mark "Omicron Capital" or any other mark.

Plaintiff first became aware of Defendant sometime in 2004. Plaintiff investigated by sending an acquaintance to drive by the listed address. Plaintiff decided not to pursue the matter after learning the address was a residence located outside of the

7

business district in St. Louis. Plaintiff did not contact Defendant regarding the use of "Omicron Capital" before filing the complaint in this case.

In January 2005, the trade publication HedgeWorld published an article misidentifying Plaintiff as Omicron Capital of St. Louis. Neither Bernstein nor Morali contacted HedgeWorld regarding this error, which was corrected in later editions of the article. Around that time, Plaintiff received inquiries from a company it invests in, as well as from one of its co-investors, concerning the St. Louis entity.

Bernstein testified as Plaintiff's designated representative about any and all known instances of consumer confusion arising from any acts by Defendant. Bernstein testified that he received a call from a broker regarding Defendant, but could not recall the name of the broker, his or her employer, the investment about which the broker called, the exact date of the call, or how, if at all, Plaintiff followed up on the call. Bernstein could not recall the name of an investor whom he says called regarding Defendant, whether that investor is currently invested with Plaintiff, the exact date of the call, or what, if anything, was done to follow up on the call. Bernstein received several "joking" calls "busting [his] chops" regarding the HedgeWorld article from persons whose names he could not recall. Def.'s 56.1 Stmt. ¶ 37.

Morali received a call from someone at an investment bank who "joked" with him about the HedgeWorld article. Def.'s 56.1 Stmt. ¶ 38. Morali had a long-standing relationship with the caller, who did not actually believe that Plaintiff was based in St. Louis. He also received a call from a representative of an investor regarding Defendant, although he could not recall the name of the representative or when the conversation took place. He did recall, however, that the particular investor is still with Plaintiff's hedge fund.

Plaintiff is aware of no prospective investors or investment targets that have been lost as the result of any actions by Defendant. No company with which Plaintiff has done business in or around Missouri has ever contacted Plaintiff regarding Defendant's use of "Omicron Capital." Although, as previously noted, Plaintiff has an investment in a St. Louis-based company, none of Plaintiff's investors is located in Missouri. No investor has withdrawn (or "redeemed") money from Plaintiff's fund due to any actions of Defendant. None of Defendant's customers has ever mistakenly contacted Plaintiff.

Defendant Omicron Capital LLC is a St. Louis-based brokerage business that is owned and operated out of his house by Richard T. Saddler ("Saddler"). Saddler is Defendant's only employee. Defendant has not done any print, radio or television advertising. In September 2003, Saddler purchased the name

9

"Omicron Holdings" from an inactive company that had no customers, for one dollar. Saddler chose the name "Omicron Capital" for his brokerage business after purchasing Omicron Holdings.

In connection with acquiring Omicron Holdings, Saddler's outside law firm, under the direction of Ronald N. Compton ("Compton"), performed a search of the "Omicron Capital" mark on the registry of the USPTO which confirmed that no other entities had registered the name "Omicron Capital" with the USPTO within the applicable service classification. Compton did not authorize a full trademark search, which would have included unregistered (common law) users, because he believed the cost was too high. Compton authorized a domain name search for "Omicron Capital" which revealed that another entity owned the domain name "omicroncapital-.com."

Defendant's application for the "Omicron Capital" mark was filed on October 10, 2003, subsequently approved for publication by the USPTO, published for opposition in The Official Gazette, and duly registered without opposition on February 15, 2005. Defendant uses the "Omicron Capital" mark on its website and on Saddler's business cards. Defendant spent between $2,500 and $5,000 on website design.

Plaintiff claims that neither Saddler nor Compton was aware of Plaintiff or of any other entities doing business under

10

the name "Omicron Capital" until the service of the summons and complaint herein, but Defendant notes that Plaintiff was at least aware that another entity owned the domain name "omicroncapital.-com."

Defendant renders services as a commercial lending broker, arranging for private companies and individuals to borrow money from banks and other lending institutions, usually securitized (or "backed") by assets of the borrower. Defendant also brokers equipment leases. Defendant does not take a financial position in any of the companies for which it brokers deals and is compensated either through a consulting fee or a fee contingent upon the closing of a deal. Defendant is not a registered broker-dealer, does not broker securities transactions, does not operate or manage a hedge fund, and does not broker PIPE transactions.

Under the name "Omicron Capital," Defendant has worked with numerous lenders and borrowers, some of which are repeat customers. Defendant is currently providing financing services for approximately six customers and finds financing for customers in amounts ranging from $50,000 to $50 million. Defendant sometimes sends potential deals to banks and venture capital firms.

Defendant has received at least one misdirected telephone call meant for Plaintiff, but Saddler does not recall the nature of

11

the call. Defendant has received at least one piece of misdirected mail meant for Bernstein, Plaintiff's co-principal.

## Summary Judgment Standard

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

12

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir. 1987); Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there is not, summary judgment is proper. Id. at 249-50.

Summary judgment is appropriate in trademark cases where the plaintiff fails to raise a genuine issue of material fact as to the likelihood that the defendant's use of the mark will confuse reasonably prudent consumers. See Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000) (affirming summary judgment for defendant where its use of mark was not likely to cause confusion as to plaintiff's product); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 584 (2d Cir. 1991); Info. Superhighway Inc. v. Talk Am., Inc., No. 03 Civ. 1995 (RWS), 2005 WL 2591899 (S.D.N.Y. Oct. 13, 2005).

**The Lanham Act Claim Is Dismissed**

Pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), one who uses in connection with services and in commerce a "false designation of origin" which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

13

connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." Here the Defendant's trademark and Plaintiff's name are identical.

However, to prevail on a claim for false designation of origin under the Lanham Act, a plaintiff must demonstrate that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product [or service] in question because of the entrance in the marketplace of defendant's mark." Gruner + Jahr USA Publ'q v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993). "[I]f no such likelihood of confusion is found, a defendant will generally not be held to have infringed plaintiff's mark." Id. at 1074.

To determine whether such a likelihood of confusion exists, courts in this circuit employ the factors set forth in Polaroid Corp. v. Polarad Elecs. Corp.:

(1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of the products; (4) the likelihood that plaintiff "will bridge the gap" and offer a service like defendant's; (5) actual confusion between services; (6) good faith on defendant's part; (7) the quality of defendant's services, and (8) the sophistication of the buyers.

14

287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961).

## The Strength Of Plaintiff's Mark

The strength of a mark is a measure of a mark's distinctiveness, i.e., the mark's "tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source." See Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996). The inquiry focuses on two factors: (i) the mark's inherent distinctiveness, and (ii) its acquired distinctiveness in the marketplace. See Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 118 (2d Cir. 1999).

Inherent distinctiveness is traditionally measured on a scale established by the Second Circuit in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1976). Marks, progressing from least to most distinctive, are described as (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. The ascending order reflects not only "eligibility to trademark status," but also the degree of protection accorded. Id. at 9-11.

Suggestive marks offer suggestions of product qualities, but do not actually describe the features of a product or service. See Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988) (finding GUNG-HO mark suggestive for action figure); BIC

15

Corps. v. Far E. Source Corp., No. 99 Civ. 11385 (HB), 2000 WL 1855116, at \*3 (S.D.N.Y. Dec. 19, 2000) (finding WITE-OUT suggestive for correction products). A suggestive mark requires "imagination, thought and perception to reach a conclusion as to the nature of the goods." See Hasbro, Inc., 858 F.2d at 73 (citation omitted). Suggestive marks are considered strong marks. Id. at 73, 75, 77.

Plaintiff's unregistered name is arguably suggestive. The word "capital" is a common generic term (generally disclaimed in the context of a federal trademark application, as in the case of Defendant's mark). "Omicron" is defined in most dictionaries as the 15th letter of the Greek alphabet. See, e.g., Oxford English Dictionary (draft rev. 2004), available at http://www.oed.com (last visited June 6, 2006). Like other Greek letters, "Omicron" or some variant is used by numerous entities in many fields as a name or trademark. Nevertheless, it is not immediately descriptive of the Plaintiff's product. Rather, consumer must exercise "imagination, thought, and perception" to associate the word with the nature of the services provided.

Even if "Omicron Capital" is considered to be suggestive, however, no evidence has been submitted to demonstrate acquired distinctiveness. Plaintiff never sought to register its mark, is precluded by the SEC from advertising to the public, and budgets only $10,000 annually for marketing. See Bristol-Myers Squibb Co.

16

v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir. 1992) (nothing that among the factors relevant to the strength of the mark inquiry "are advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use.").

Prior to filing this lawsuit, Plaintiff never monitored the use of "Omicron Capital" by third parties and did not oppose Defendant's application to register "Omicron Capital" as a trademark. Plaintiff responded to Defendant's first set of document requests, including one seeking all documents by which it marketed, advertised or promoted the mark, with a minimal number of documents, suggesting that Plaintiff makes no use of the "Omicron Capital" mark in commerce except through one PowerPoint presentation provided to a limited number of potential investors.

The "Omicron" name also has a significant internet presence and provides the basis for the names of many websites. "It is well settled that third-party registration and use dilutes the strength of a trademark." Franklin Res., Inc. v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 328 (S.D.N.Y. 1997) (finding that third party use of the name "Franklin," as evidenced by telephone listings, diminished the strength of the plaintiff's mark despite the duration and volume of business); Vista Food Exch., Inc. v. Vistar Corp., No. 03 Civ. 5203, 2005 WL 2371958 (DRH), at *8 (E.D.N.Y. Sept. 27, 2005) (quoting Streetwise Maps, Inc. v.

17

Vandam, Inc., 159 F.3d 739, 744 (2d Cir. 1998)) (granting summary judgment for defendant and noting that "extensive third-party use of the term 'Vista,' . . . still serves to weaken Plaintiff's mark despite the different nature of the other companies.").

Because of Plaintiff's failure to cultivate any association between itself and "Omicron Capital," it cannot demonstrate that its mark has acquired significant secondary meaning and, therefore, the first Polaroid factor tends to favor Defendant. See W.W.W. Pharm. Co., Inc. v. Gillette Co., 984 F.2d 567, 572 (2d Cir. 1993) (finding that although plaintiff's mark was suggestive, it was not strong because the product suffered from low sales and low national recognition); Haven Capital Mgmt., Inc. v. Havens Advisors, L.L.C., 965 F. Supp. 528, 531 (S.D.N.Y. 1997) ("[Plaintiff's] clientele are more likely attracted to its conservative investment advice, which emphasizes long-term growth at a reasonable price, than its name.").

**The Similarity Of The Marks**

In determining whether the similarity of the marks is likely to cause confusion, courts "should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." Franklin Res., Inc., 988 F. Supp. at 328 (quoting Lang, 949 F.2d at 581). The words comprising Plaintiff's and Defendant's mark are

18

identical. Nevertheless, each party's use of the mark is quite limited. Plaintiff does not maintain a website and is strictly limited as to its ability to advertise to the public. Defendant also uses "Omicron Capital" in a limited fashion, only on its website and business cards, not purchasing any significant advertising. Because prospective purchasers are unlikely ever to perceive the marks before becoming familiar with Plaintiff's or Defendant's businesses, confusion is unlikely. The similarity of the marks in this situation is neutral.

## The Proximity Of The Products

The third Polaroid factor considers "whether and to what extent the two products compete with each other." Franklin Res., Inc., 988 F. Supp. at 329; Info. Superhighway, 2005 WL 2591899, at *8 ("When two products compete with each other, the likelihood increases that the use of similar marks will cause consumer confusion.").

Plaintiff and Defendant compete in entirely different markets. Plaintiff's fund commands a $3 million average investment ($5 million median investment) by investors who believe that Plaintiff's financial strategy will result in a positive performance with lucrative returns. Through its hedge fund management, Plaintiff takes a financial position, both through debt and equity, in the companies in which it invests. Plaintiff's hedge fund has

19

successfully reaped significant management and performance fees since its founding in 1997.

Defendant acts as a broker, bringing together banks and private companies to complete and close lending transactions. On some occasions, at the invitation of various equipment distributors and manufacturers, Defendant brokers financing transactions between banks and parties desiring to lease equipment. For its services, Defendant receives a flat-rate consulting fee or a commission from either the lender or borrower upon the close of the lending transaction. Defendant is not a hedge fund and never takes a financial position in the parties on either side of a lending transaction.

The services provided by Plaintiff and Defendant are offered to different markets and are not in proximity. See Haven Capital Mgmt., Inc., 965 F. Supp. at 531-32 (finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because "the services that the parties render to their investors are significantly different"); Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 449 (S.D.N.Y. 1982) (finding that the plaintiffs, who advertised and made small loans to individual consumers served an "entirely different market" than defendant, who made large business loans for business purposes only). As in Haven and Beneficial, Plaintiff and

20

Defendant here are involved with "vastly different asset classes."
See Haven Capital Mgmt., Inc., 965 F. Supp. at 532.

Plaintiff has relied upon Morningside Group Ltd. v.
Morningside Capital Group, L.L.C., 182 F.3d 133 (2d Cir. 1999), a
case involving a trademark dispute between two investment firms.
However, in Morningside, the court reviewed the Polaroid factors
and found, among other things, that the proximity of services
factor weighed in the plaintiff's favor because the parties were
"in competition" as they "both [sought] out direct investment
opportunities for themselves and others." Id. at 140. The court
reasoned that because the parties "provide[d] essentially the same
service to the same customer base, their services [were] related
and proximate." Id. (quotations omitted). Both parties operated
their businesses, and competed for business, in Westport, Connecti-
cut. See id. at 136 n.1.

Like both parties in Morningside, Plaintiff is a hedge
fund that directly invests its own funds and the funds of its
clients. Defendant, however, is a broker who arranges loans
between banks and individuals and businesses, including loans for
end users desiring equipment leases. A large proportion of
Defendant's business involves brokering loans that are secured by
a borrower's accounts receivable, known as asset-based financing.
Plaintiff has not presented evidence that it brokers or directly
finances asset-based loans or equipment leases. The website for

21

Defendant's business, which Plaintiff claims is "confusingly similar to plaintiff's services," (Pl.'s Mem Opp'n, at 9) states on every page that Defendant is in the business of asset-based financing.

Plaintiff has characterized its business as "providing . . . financing to small companies," (Pl.'s Mem. Opp'n, at 2) but Plaintiff has not identified the size or nature of its investments.

The lack of proximity of the services provided by the parties favors Defendant.

## The Likelihood That Plaintiff Will Bridge The Gap

The fourth Polaroid factor refers to the "senior user's interest in preserving avenues of expansion and entering into related fields." Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 504 (2d Cir. 1996). No evidence has been presented tending to show that Plaintiff has any intention of performing brokering services for customers any time soon. Plaintiff's customers would not think it at all likely that Plaintiff had begun a brokerage business based in St. Louis. As such, this factor weighs in Defendant's favor.

**Actual Confusion**

Actual confusion, the fifth factor in the Polaroid analysis, can be shown through evidence of particular (sometimes referred to as "anecdotal") incidents of confusion, as well as through market research studies. See Franklin Res., Inc., 988 F. Supp. at 331. When asked in an interrogatory to identify each person who had been confused by Defendant's use of "Omicron Capital," Plaintiff replied that persons who read the HedgeWorld article would be confused and that there have been inquiries "from time to time."

Furthermore, the statements of Plaintiff's principals do not demonstrate that any consumers were ever confused about the source or origin of Plaintiff's or Defendant's services. In most instances, neither Bernstein nor Morali could recall the name of the callers with whom they had spoken, the dates of the calls or how, if at all, the calls were followed up on by Plaintiff. At most, Plaintiff can show only that it received inquiries regarding its affiliation with Defendant, which does not amount to actual confusion. See Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001) ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire

the inquiry itself."). In many cases, these inquiries were mere jokes from entities quite familiar with Plaintiff's business.

Plaintiff has admitted in deposition that it is aware of no potential or current investors or investment targets that have made investment decisions based on Defendant's use of the mark. Under the Polaroid analysis, "[t]he relevant confusion to be avoided is that which affects purchasing decisions, and not confusion generally." Sunenblick v. Harrell, 895 F. Supp. 616 (S.D.N.Y. 1995), aff'd, No. 95-7906, 1996 WL 280477 (2d Cir.), cert. denied, 519 U.S. 964 (1996) ("That neither [the caller] nor his customers were finally deceived as to a purchasing decision further buttresses the fact that the initial confusion of a retailer does not support a finding of actual confusion."); Lang, 949 F.2d at 583 (evidence that plaintiff received over four hundred phone calls and several letters provided "no reason to believe that confusion represented by the phone calls could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation."). Because Plaintiff has come forward with neither market surveys nor evidence of particular incidents of confusion affecting any purchasing decisions, this factor weighs in favor of Defendant.

24

## Defendant's Good Faith In Adopting The Mark

The sixth Polaroid factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Nora Beverages, Inc., 269 F.3d at 124. There is no evidence that Defendant adopted "Omicron Capital" with knowledge of Plaintiff's mark, much less that it adopted the mark with the intention of capitalizing on Plaintiff's reputation and goodwill. Instead, Defendant adopted the name "Omicron Capital" after acquiring an interest in "Omicron Holdings." In connection with purchasing Omicron Holdings, Plaintiff sought the advice of an attorney who performed a search of "Omicron" on the federal trademark registry and determined that no other entities had registered the mark within the applicable class. Thus, this factor favors Defendant.

## The Quality Of Defendant's Services

Plaintiff has not adduced any evidence regarding the next Polaroid factor: "whether the senior user's reputation could be tarnished by the inferior merchandise of the junior user." Franklin Res., Inc., 988 F. Supp. at 337 (finding that the defendant's methodology in collecting loans was not "so extreme or unwholesome that it would work harm upon another company with the name 'Franklin.'"). Defendant, a sole proprietorship, has

25

successfully brokered lending transactions for hundreds of clients and has enjoyed repeat business from a number of them. See Beneficial Corp., 529 F. Supp. at 451 (nothing under the quality factor of the Polaroid analysis that "[t]he fact that a substantial portion of defendant's business is from repeat customers is at least some indication that its customers are satisfied with its services: i.e., that it furnished a product of reputable quality."). Because Plaintiff has come forward with no evidence to demonstrate that the quality of Defendant's services would tarnish Plaintiff, this factor weighs in Defendant's favor.

## The Sophistication Of The Buyers

The eighth and final Polaroid factor acknowledges that "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1045 (2d Cir. 1992). The relevant consumer to be evaluated under this factor is not the general public, but rather "those members of the public who are or may become customers of either" party. Beneficial Corp., 529 F. Supp. at 450 (internal citations omitted) (noting that given "convincing evidence of the sophistication of defendant's customers . . . the possibility of the confusion against which the trademark laws protect must be characterized as remote.").

26

Plaintiff's investors are high net worth individuals and entities that are willing to part with a minimum of $500,000 for up to a year with the expectation that their investment will lead to significant return. Plaintiff's "smart" and "savvy" investors perform research and due diligence before investing their money with Plaintiff's fund, going so far as to investigate Plaintiff's principals.

Although the transactions that Defendant brokers are of a different nature than Plaintiff's, its customers are similarly experienced in the financial sector. Its customers, including banks and private companies, repeatedly enter into complex financial transactions with multiple parties.

Given their sophistication, the consumers of Plaintiff's and Defendant's services are unlikely to be confused based upon Defendant's use of "Omicron Capital." See Haven Capital Mgmt., Inc., 965 F. Supp. at 531-33 (finding that investment firm's customers were sophisticated where a minimum $1 million investment was required to become a limited partner and most clients came through existing clients or referral sources); Beneficial Corp., 529 F. Supp. at 450 ("The fact that the use of a particular service entails both substantial funds and a fairly detailed purchasing process is recognized as being a significant index of buyer sophistication."); Citigroup Inc., 171 F. Supp. 2d at 349 ("There would appear to be a difference between a one shot purchase of an

27

item to wear or consume and initiating a continuing financial relationship."). Thus, the final factor favors Defendant.

In sum, the balance of the Polaroid factors tips decidedly in Defendant's favor, demonstrating that there is no likelihood that Defendant's use of "Omicron Capital" will result in consumer confusion.

## Cancellation And Injunction Are Denied

To prevail on a claim of cancellation, Plaintiff "must show that (1) it has standing to bring a cancellation claim, and (2) there are valid grounds for why the registration should not continue to be registered." Citigroup Inc. v. City Holding Co., No. 99 Civ. 10115 (RWS), 2003 WL 282202, at *14 (S.D.N.Y. Feb. 10, 2003). The only ground for cancellation advanced by Plaintiff is likelihood of confusion. Since it has been determined that there is no risk of confusion, no basis for cancellation exists.

Similarly, under the Lanham Act, a showing of likelihood of confusion is the sine qua non to support the entry of a permanent injunction. To obtain a permanent injunction, a plaintiff must demonstrate (1) actual success on the merits and (2) irreparable harm. See e.g., Gucci America, Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003); Wojnaro-wicz v. Am. Family Ass'n, 745 F. Supp. 130, 148, n. 13 (S.D.N.Y.

1990). Plaintiff's inability to demonstrate that Defendant's use of "Omicron Capital" will result in a likelihood of confusion precludes a finding of success on the merits, and thus precludes any injunctive relief.

The circumstances in this case differ considerably from those presented in Weiner King, Inc. v. Wiener King Corp., 615 F.2d 512 (C.C.P.A. 1980), where the court held that, based on the federal trademark policy of "encouraging prompt registration of marks by rewarding those who first seek registration under the Lanham Act," a junior user/senior registrant may be permitted "to retain the nationwide protection of the act restricted only by the territory of the prior user." Id. at 523-24 (quoting In re Beatrice Foods Co., 429 F.2d 466, 474 n.13 (C.C.P.A. 1970)). In Weiner King the court fashioned a concurrent use arrangement between the parties only after two courts had determined that the parties' marks were confusingly similar and that "confusion in the marketplace if the marks [were] used side by side [was] not only likely but certain." Id. at 521.

No such finding of confusion has been made here. Moreover, Defendant has not sought, through either formal or informal means, to enforce its trademark registration against Plaintiff or to expand into Plaintiff's market, as was the case in Weiner King; see also Architemps, Inc. v. Architemps, Ltd., No. 88 Civ. 5152 (RO), 1989 WL 80300 (S.D.N.Y. Apr. 16, 1989) (holding

that junior user/senior registrant of mark, an architecture firm, had superior right to expand into area into which neither it nor defendant, also an architecture firm, had expanded). Plaintiff has not evidenced any intent to seek registration of the "Omicron Capital" mark. Because there is no likelihood that Defendant's use of "Omicron Capital" will result in confusion among relevant consumers and because Defendant has no intention to expand its services to include any similar to Plaintiff's, no concurrent use registration is appropriate at this time.

## The Unfair Competition Claim Is Dismissed

To prevail on a claim for unfair competition under New York common law, "a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith." Info. Superhighway, 2005 WL 2591899, at *11 (quoting Philip Morris USA Inc. v. Felizardo, No. 03 Civ. 5891 (HB), 2004 WL 1375277 (S.D.N.Y. June 18, 2004)) (dismissing plaintiff's common-law unfair competition claim on summary judgment because Lanham Act claim had been dismissed and plaintiff was unable to show bad faith on part of defendants); Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) (dismissing Lanham Act claims and state law unfair competition claims on summary judgment, noting that "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of

30

another. Central to this notion is some element of bad faith.").
No evidence has been presented to establish that Defendant acted in
bad faith in adopting and registering the mark "Omicron Capital."
As a consequence, the claim for unfair competition is dismissed.

**Conclusion**

For the reasons set forth above, the motion by Defendant
for summary judgment is granted, and the cross-motion of Plaintiff
is denied. Submit judgment on notice.

It is so ordered.

**New York, NY**
**June        , 2006**

**ROBERT W. SWEET**
**U.S.D.J.**